**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| SHERIDAN BROADCASTING NETWORKS, INC., | Case No. 16-20722 (TPA) |
| Debtor. | |
| NBN BROADCASTING, INC., | |
| Movant, | Document No. _____ |
| v. | |
| SHERIDAN BROADCASTING NETWORKS, INC., | |
| Respondent. | |

**EMERGENCY MOTION OF NBN BROADCASTING, INC. FOR RELIEF FROM
THE AUTOMATIC STAY TO ENFORCE THE TERMS OF A SETTLEMENT
AGREEMENT BETWEEN NBN BROADCASTING, INC. AND SHERIDAN
BROADCASTING NETWORKS, INC. IN THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

NBN Broadcasting, Inc. ("NBN"), by and through its counsel, Reed Smith LLP,

hereby moves (this "Motion") this Court (i) for the entry of an order, pursuant to section 362(d)

of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), Rule

4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1

of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Western District of

Pennsylvania (the "Local Rules"), granting NBN emergency relief from the automatic stay to

enforce the terms of a settlement agreement between NBN and Sheridan Broadcasting Networks,

Inc. (the "Debtor") through proceedings pending in the United States District Court for the

Western District of Pennsylvania (the "District Court"), and (ii) for the entry of an order,

- 1 -

pursuant to Bankruptcy Rule 9006(c) and Local Rule 9013-2, shortening the applicable notice

period and scheduling an expedited pre-trial conference and evidentiary hearing as soon as

possible to consider the substantive relief requested in this Motion.  In support of the Motion,

NBN relies upon the *Declaration of Chesley Maddox-Dorsey* ("Maddox-Dorsey Decl."), filed

contemporaneously herewith, and respectfully avers as follows:

### PRELIMINARY STATEMENT

1.      In March 2012, NBN, as the minority partner of the American Urban

Radio Networks ("AURN" or the "partnership") partnership, commenced an action against the

Debtor, as the majority partner of AURN, in the District Court, because the Debtor engaged in

self-dealing in breach of its fiduciary duties to the minority partner.  The Debtor used its control

of AURN to extract money from AURN through a series of related-party transactions solely for

the benefit of its parent, Sheridan Broadcasting Corporation ("Sheridan"), and affiliates and at

NBN's expense.  More specifically, the Debtor transferred the overwhelming majority

(ultimately over 93%) of Sheridan's corporate overhead to AURN under the guise of charges for

so-called "general and administrative" ("G&A") expenses and used its control of the partnership

to force AURN to make these excessive and unjustified related party payments to the Debtor.

The Debtor's G&A allocations had no relationship to the value of services that it or any of its

affiliates supposedly provided to AURN.  In fact, as a result of a third party subpoena served on

the Debtor's auditor in the District Court litigation, NBN learned that the Debtor in 2008 secretly

changed its methodology of allocating its G&A to AURN from a time and expense basis to a

methodology that was based on the proportion of total revenues that the Debtor contributed to

Sheridan, even though the Debtor was a partner in AURN who owed NBN fiduciary duties, such

a methodology solely served to benefit the Debtor, its parent Sheridan and their affiliates and

bore no relationship to the actual costs of programming.  NBN was harmed by these related-party

transactions because they reduced the funds available for distribution by AURN to NBN.

   2.    At trial in October 2015, the parties reached a settlement agreement to

resolve the District Court litigation and all pending state court litigation.  Pursuant to the

settlement agreement, the Debtor was given an option to purchase NBN's minority partnership

interest in AURN by making three payments of varying amounts on or before October 30, 2015,

December 31, 2015, and March 1, 2016.  Upon the Debtor's exercise of its option to purchase by

making the third payment on a timely basis, NBN's minority partnership interest transfers

automatically and immediately to the Debtor.  If the Debtor failed to exercise its option to

purchase NBN's minority partnership interest by not making one or more of the three payments

by the applicable deadline, the Debtor's majority partnership interest transfers automatically and

immediately to NBN.  To facilitate the automatic and immediate transfer of possession of their

clients' partnership interest, the parties' trial counsel agreed to hold the parties' respective

partnership interests in escrow.  Thus, the settlement agreement was intended to accomplish a

complete "divorce" of the partnership between NBN and the Debtor by no later than March 1,

2016.  No financial contingencies existed with respect to the payments and no right to cure

existed with respect to any payment deadline.  In short, when the Debtor failed to exercise its

option to purchase NBN's partnership interest by tendering payment on March 1, 2016, the

Debtor's 51% partnership interest transferred automatically, immediately, and forthwith to NBN

as consideration for its substantial claims for compensatory and punitive damages at trial.

   3.    On or before October 30 and December 31, 2015, the Debtor made the

first two payments on a timely basis pursuant to the settlement agreement.  On February 24,

2016, however, the Debtor requested an extension of time to exercise the purchase option.

Consistent with the parties' settlement terms and goal of accomplishing a complete "divorce" of the partnership by no later than March 1, 2016, NBN did not grant the Debtor any extension of time. The Debtor was undeterred in its desire for an extension of time. On March 1, 2016—the last day the Debtor could exercise its option to purchase and the day that title to the Debtor's majority partnership interest was scheduled to be transferred to NBN, and only hours after learning that the District Court had set an emergency hearing to enforce the terms of the settlement agreement—the Debtor commenced this chapter 11 bankruptcy case, trigging the automatic stay and frustrating NBN's legitimate efforts to enforce the settlement agreement in the District Court.

4.      Notwithstanding the Debtor's blatant attempt to forestall and delay the legal effect of the settlement agreement, including the transfer of its 51% partnership interest, the Debtor's opportunity to purchase NBN's minority partnership interest in AURN lapsed, and legal title to the Debtor's majority partnership interest in AURN vested in NBN, immediately and automatically by operation of the settlement agreement and without any further or affirmative action by either party when the Debtor failed to make the payment to NBN on March 1, 2016. The settlement agreement was intentionally self-executing to achieve the parties' goal of a complete and final partnership "divorce" on March 1. Nothing in the Bankruptcy Code tolls the parties' contractual deadlines or stays the parties' settlement agreement from taking effect pursuant to its terms. Although NBN believes that title to the majority partnership interest in AURN vested in NBN on March 1 by operation of the settlement agreement, NBN is seeking relief from the automatic stay to enforce the terms of the settlement agreement against the Debtor in proceedings pending in the District Court, including, without limitation, if authorized by the District Court, taking title to (to the extent necessary), and possession of, and exercising control

over, all partnership interests in AURN in accordance with the terms of the settlement

agreement.

5.      Viewing the totality of the circumstances, "cause" exists to schedule an

expedited evidentiary hearing on this Motion and to grant NBN emergency relief from the

automatic stay because:  (i) the Debtor filed this chapter 11 case in bad faith solely in an attempt

to frustrate NBN's legitimate  right to enforce the settlement agreement and (ii) the financial

self-dealing and unjustified related-party transactions between the Debtor and AURN that have

occurred on a monthly basis over the course of more than four years continue unabated. As

recently as late December 2015 and January and February 2016, the Debtor continued to cause

AURN to make substantial related-party payments to the Debtor without receiving any

reasonably equivalent value in return to the detriment of NBN.  Since 2012 alone, the Debtor has

drained more than $6,000,000 from AURN through these wrongful and unjustified related-party

payments.

6.      While the Debtor's historical track record of looting AURN should be

sufficient to justify relief from the automatic stay, the Debtor's actions since entering into the

settlement agreement demonstrate that the Debtor, Sheridan, and its affiliates, including Ronald

Davenport Sr. and Ronald Davenport Jr., have continued to:  (i) take massive amounts of money

from AURN without declaring any distributions or justifying the withdrawals; (ii) cause AURN

to withhold payments to AURN's affiliated radio stations that are critical to its business, thereby

jeopardizing AURN's business reputation and goodwill; (iii) attempt (and may have succeeded)

without proper partner authorizations to increase a factoring loan in AURN's name; (iv) attempt

to factor AURN's February 2016 accounts receivable today or early next week to take even more

cash out of AURN; and (v) cause AURN's sales to decline, employees to resign and financial

condition to deteriorate so as to negatively affect and impair the value of AURN's business.  The

Debtor's transparent and cynical use of the bankruptcy process solely to thwart the transfer of its

51% partnership interest automatically, immediately, and forthwith should not be tolerated.  This

is especially true when the vast majority of the listed unsecured creditors (apart from the

Debtor's and the individual defendants' trial counsel) are unsecured creditors who the Debtor

was supposedly advancing itself funds to pay at the beginning of each month for the past several

years.

    7.  In the absence of immediate, emergency relief from the automatic stay to

permit NBN to enforce the settlement agreement and compel specific performance, the value of

the majority partnership interest will be severely impaired, irreparable harm to the business of

AURN will occur, and material financial loss to NBN is virtually certain given the Debtor's

conduct.

## JURISDICTION AND VENUE

    8.  The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

    9.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

    10.  The statutory predicates for the relief requested herein is section 362(d) of

the Bankruptcy Code, Bankruptcy Rules 4001 and 9006(c), and Local Rule 4001-1 and 9013-1.

## FACTUAL BACKGROUND

**A.  The Parties And The Partnership**

    11.  The AURN general partnership was formed on December 13, 1991, when

the Debtor and NBN entered into a written Partnership Agreement.

12.     NBN is a New York Corporation that has been the minority partner in AURN with a 49% ownership interest since AURN's formation pursuant to a written Partnership Agreement.  The president of NBN is Chesley Maddox-Dorsey ("Maddox-Dorsey").

13.     The Debtor is a Pennsylvania corporation that is a wholly owned subsidiary of Sheridan Broadcasting Corporation ("Sheridan").  The Debtor has been the majority partner in AURN with a 51% ownership interest since AURN's formation pursuant to the Partnership Agreement.  Sheridan is owned by the Davenport family, with Ronald Davenport Sr. and his wife Judith Davenport holding approximately 90% of the shares and his three adult children, including Ronald Davenport Jr., holding the remaining 10% of Sheridan's shares. Davenport Sr. is the founder, chairman, and chief executive officer of Sheridan.  Davenport Sr. also serves as one of the Debtor's representatives on the AURN management committee.

14.     AURN is a radio broadcasting network.  Broadcasting networks organize groups of affiliated radio stations that are often dispersed over a large geographic area, typically nationwide.  The network purchases blocks of advertising time from the affiliated radio stations. The network then resells the advertising time that it has purchased to national advertisers. Networks function to allow national advertisers to efficiently place advertisements on radio stations without expending the time and effort of negotiating the purchase of time with each individual station.  The network, when it resells the time to advertisers, marks up the price that it originally paid the affiliated radio stations.  A network's revenue comes from the mark-up on the advertising time it has purchased when it is sold to the national advertisers.  Payment is made in the following order:  an advertiser paying AURN for the contracted advertising time and AURN subsequently paying a portion of that money to the affiliate for the purchased time.

15.     The Partnership Agreement created the process by which the partners would manage AURN.  Pursuant to its terms, AURN is managed by a management committee, which normally consists of two NBN representatives and two Debtor representatives.  The management committee also has a vacant fifth seat, which may be filled by Davenport Sr. in the event of a tied vote.  This power to appoint a fifth member gives the Debtor control of the management committee and of AURN.  See Partnership Agreement, attached to the Maddox-Dorsey Decl. as **Appendix A**.

**B.      Illusory G&A Allocation Charges**

16.     The Partnership Agreement provides that the partners may provide certain network programming to AURN, and that AURN will reimburse the partners for the "actual costs" of providing programming to the partnership.

17.     The Debtor, through its affiliates, provides programing to AURN and seeks payment from AURN on a monthly basis for the actual costs in providing such programming.  In addition to invoicing AURN for the actual costs in providing programming to AURN, the Debtor also invoices AURN for a number of other categories of costs that are unrelated to the provision of programming.  The largest of these other categories is listed in the Debtor's invoices as the "G&A Allocation" line item.  Since 2008, this G&A allocation amount has been the highest component of charges that the Debtor assessed to AURN.  The G&A allocation regularly exceeds the costs that the Debtor charges AURN for its programming expenses.  Despite the size of the G&A allocation (which is often more than $140,000 a month), the Debtor failed to disclose or justify its secret methodology for allocating its parent's corporate overhead to AURN.  The evidence at the hearing will show that the G&A allocation line item is

a related-party payment that goes to cover almost all of Sheridan's corporate overhead, including the $500,000 annual "salary" of Davenport Sr.

18.    Additionally, although the Debtor only provided invoices to AURN some six to eight weeks after the end of the particular month, the Debtor nonetheless forced AURN to pay it at the beginning of each month, thereby advancing itself funds before incurring any actual expenses for the coming month.  Through May 2015, the Debtor took significantly more money through advances than it accounted for through monthly invoices, and since May 2015, the Debtor has not accounted for the substantial monthly advances at all.  In other words, the Debtor regularly failed to credit AURN for the amounts that it previously received from AURN in excess of the purported "actual costs" in its subsequent invoices to AURN.  The failures to account for differences and credit AURN for any surpluses paid highlight that (i) the related-party transactions at issue here are wholly unrelated to services that the Debtor allegedly provides to AURN and (ii) the Debtor has incurred a significant liability to AURN.

19.    As a result of these improper practices, the Debtor received a total of $4,704,322.67 of payments from AURN in 2012, $3,300,000.00 of payments from AURN in each of 2013 and 2014, and $4,125,000.00 of payments from AURN in 2015.  Of these amounts, at least $5,993,513.00 was attributable to unjustified G&A allocations.  The actual total G&A allocation likely is much more, but NBN has been unable to track G&A allocations after May 2015 because the Debtor stopped issuing invoices to AURN altogether.  Even without invoices, however, monthly advances from AURN to the Debtor have continued at a rate of $250,000 to $300,000 per month through February 2016.  The Debtor's extracting such a significant amount of money from AURN has resulted in sharply reduced funds available for distribution and harm to NBN.

20.     In effect, the Debtor has used and is using its control of AURN to siphon

funds from the partnership to subsidize and prop up its parent Sheridan's operations.  In doing

so, the Debtor flagrantly disregarded its fiduciary duties to NBN.

**C.      The District Court Litigation And Settlement Agreement**

21.     On March 20, 2012, NBN commenced an action against the Debtor in the

District Court seeking damages for breaches of the Debtor's fiduciary duties to NBN.  See NBN

Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc., et al., Civil Action No. 12-346, Doc.

No. 1 (W.D. Pa.).

22.     On October 20, 2015, counsel for the parties selected a jury and delivered

opening statements in the trial in the District Court litigation.  Doc. Minute Entry dated October

20, 2015.

23.     On October 23, 2015, after two days of evidence during NBN's case-in-

chief and with the aid of the District Court and its law clerk, the parties reached a confidential

settlement agreement ("Settlement Agreement") resolving all claims in the District Court action

and any related litigation between the parties, including any parallel state court litigation.  See

Doc. Nos. 194, 196.

24.     On October 28, 2015, the Court entered an Order administratively closing

the District Court action, stating that "[j]urisdiction is retained over the completion and

performance of the settlement agreement."  Doc. No. 195.

25.     The Settlement Agreement was reached through negotiations during

mediation sessions dating back to at least May 2015 that were overseen by the District Court's

law clerk who served as mediator.  See Doc. Nos. 121, 128-30, 131-32, 133, 135, 137-38.

26.     The material terms of the Settlement Agreement are set forth in a sealed transcript of Court proceedings dated October 23, 2015.  See Doc. No. 196.

27.     There is no dispute that the Settlement Agreement exists.  The Settlement Agreement was reached through court-assisted mediation and the terms were described on the record before the jury was released.

28.     Generally, the Settlement Agreement contemplated a partnership "divorce" and complete separation on or before March 1, 2016, whereby either the Debtor or NBN would acquire the entire AURN partnership through the automatic and immediate transfer of the other partner's partnership interest being held in escrow by the parties' respective trial counsel.

29.     Pursuant to the Settlement Agreement, the Debtor was given an opportunity or option to purchase NBN's minority partnership interest in AURN by making three payments to NBN of varying amounts on or before:  (i) October 31, 2015 ("Payment One"); (ii) December 31, 2015 ("Payment Two"); and (iii) March 1, 2016 ("Payment Three").  Upon timely completion of the third payment, NBN's minority partnership interest transfers automatically and immediately to the Debtor.  The parties expressly agreed that the right to make Payment Three lapsed on March 1, 2016, without any cure period.

30.     Conversely, if the Debtor chose not to exercise its option to purchase NBN's minority partnership interest by failing to make one or more of the three payments by the applicable deadline, the Debtor's majority partnership interest transfers automatically and immediately to NBN as consideration for the dismissal and release of claims against the Debtor.

31.     The parties' trial counsel are required to hold the parties' respective partnership interests in escrow to facilitate the automatic and immediate transfer of NBN's

minority partnership interest to the Debtor (in the event of timely financial performance by the

Debtor) or the Debtor's majority partnership interest to NBN (in the event of a failure to make

one or more of the payments by the applicable deadline).

32.    In sum, in exchange for the dismissal and release of NBN's claims,

including NBN's substantial claims for compensatory and punitive damages against the Debtor

and the individual defendants, the Debtor was required to tender the sum of all three payments or

its 51% partnership interest in AURN on or before March 1, 2016.

**D.    Breach Of Settlement Agreement**

33.    On February 24, 2016, NBN's counsel received a letter (the "Extension

Letter") from the Debtor's counsel stating in pertinent part:  "Our client is requesting an

extension to tender the final payment due under the agreement reached before Judge Cercone.

Please also be advised that our client has authorized us to file a Petition under Chapter 11 of the

Bankruptcy Code if an extension is not granted."  A true and correct copy of the Extension Letter

is attached to the Maddox-Dorsey Decl. as **Appendix B**.

34.    Consistent with the parties' settlement terms and goal of accomplishing a

complete "divorce" of the partnership by no later than March 1, 2016, NBN did not grant the

Debtor an extension of time to make the final payment.

35.    On March 1, 2016, the Debtor failed to make Payment Three pursuant to

the terms of the Settlement Agreement, and expressly no right exists to make this payment after

March 1, 2016.

36.    By the Debtor's failure to make Payment Three on March 1, 2016, legal

title to the majority partnership interest in AURN immediately and automatically vested in NBN

by operation of the Settlement Agreement and without any further or affirmative action by either

party.  Accordingly, the Debtor no longer has any right to own, possess, or control any interest in AURN or to participate in or conduct AURN's ongoing business.

37.    The Debtor and its escrow agent also failed to transfer possession of the Debtor's majority partnership interest in AURN to NBN on March 1, 2016.

38.    The Debtor's failure to make Payment Three or immediately transfer possession of the Debtor's majority partnership interest in AURN to NBN on March 1, 2016, is a material breach and default under the clear and essential terms of the Settlement Agreement.

39.    When the Debtor and its escrow agent failed to transfer the Debtor's partnership interest to NBN on March 1, 2016, NBN informed the District Court and immediately filed an expedited motion to enforce and compel specific performance with the District Court on March 1.  The day before the Debtor's trial counsel and escrow agent filed a motion seeking to withdraw as counsel.  See Doc. No. 204.

## E.    The Bankruptcy Case

40.    At approximately 2:00 p.m. on March 1, 2016, the District Court issued an order advising of the "plaintiff's intent to file a motion for an emergency hearing pertaining to enforcement of the settlement [agreement]" and ordering the parties and counsel to appear for an emergency status conference/evidentiary hearing on Wednesday, March 2, 2016, at 11:00 a.m., to address the pending motion to enforce and compel specific performance and the motion to withdraw.  See Doc. No. 205.

41.    Approximately two hours later on March 1, 2016 (the "Petition Date"), and consistent with the threat posed by the Debtor in the Extension Letter, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court").

42.     At the March 2 emergency hearing, in light of the Debtor's filing of its voluntary petition, the parties agreed that the most prudent course of action was for NBN to seek prompt relief from the automatic stay in this Bankruptcy Court, without prejudice.

**F.     The Debtor's Pattern And Practice Of Abusing Its Control Of AURN Has Continued After The Settlement Agreement And Has Caused AURN's Employees To Depart, Affiliate Compensation Arrearages To Grow, Sales To Decline, And Financial Condition To Worsen, Thereby Impairing The Value Of AURN.**

43.     To effect Payment One, on October 27, 2015, the Debtor caused AURN to issue a check in the amount of Payment One to the Debtor.  After depositing the AURN check made payable to the Debtor, the Debtor then issued a check payable to NBN in the amount of Payment One.  The Debtor did not cause AURN to declare a distribution in connection with the issuance of the October 27, 2015 check, nor was the October 27, 2015 check issued to reimburse any expenses incurred on behalf of AURN.  Without declaring a distribution in accordance with the terms of the Partnership Agreement and without any evidence that the check was paying any expense of AURN, the Debtor continued its pattern and practice of looting AURN to serve its own financial interests.

44.     In fact, the Debtor continued its practice of causing AURN to make related-party payments to the Debtor each and every month since October 2015.  In October 2015, along with the amount of Payment One, the Debtor caused AURN to issue checks to the Debtor and its affiliates in the amount of $296,000 for a total of $796,000.  In November 2015, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling $346,000.  In December 2015, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling $296,000 and an unauthorized wire transfer to the Debtor in the amount of $625,000 (which the Debtor apparently used to fund its obligation to make Payment Two on or about December 31,

2015).[1]  In January 2016, the Debtor caused AURN to issue checks to the Debtor and its

affiliates totaling $296,000.  In February 2016, the Debtor caused AURN to issue checks to the

Debtor and its affiliates totaling at least $171,000.  In the aggregate, since June 2015, the Debtor

has caused AURN to pay the Debtor and its affiliates more than $3.7 million in related-party

payments.

45.     In addition to forcing AURN to continue making unjustified related-party

payments to the Debtor, the Debtor attempted to cause AURN to incur an additional $1.5 million

of debt pursuant to a factoring loan to be supplied by Triumph Commercial Finance

("Triumph"), which previously provided a factoring loan in June 2015.  Upon information and

belief, the Debtor was attempting to cause AURN to incur this additional debt to enable the

Debtor to use the proceeds of the new factoring loan to make Payment Two or Payment Three.

In doing so, the Debtor was improperly attempting to finance the purchase of the minority

partnership interest by creating a partnership debt and a potential liability to NBN—in violation

of the terms of the Settlement Agreement itself.

46.     In attempting to increase the factoring loan limit, the Debtor attempted to

conceal its lack of authority to cause AURN to incur additional factoring loan debt by

manufacturing fictitious meeting minutes.  The Debtor did so by purportedly convening an

AURN "management committee" meeting on December 21, 2015, without providing any prior

notice of the meeting to NBN's representatives on the AURN Management Committee, even

though NBN continued to be a 49% partner in AURN, the Partnership Agreement continued to

govern the AURN partnership, and the Settlement Agreement only provided the Debtor with

---

[1]  This wire payment was made in violation of the Partnership Agreement, which requires that
withdrawals of partnership funds be done by checks that are co-signed by representatives of
each partner.

operational control of Sheridan until March 1, 2016.  After he illegally convened this purported

meeting, Davenport Jr. sent an email dated December 21, 2015, to Chesley Maddox-Dorsey of

NBN stating that "the AURN management committee held a special meeting at 2 pm in order to

ratify all actions taken to increase the amount available by AURN to be factored by Triumph

from $2,000,000 to $3,500,000."  Copying Triumph's representatives, NBN responded to

Davenport Jr. and the Debtor on December 22, 2015 explaining that the Debtor had no authority

or ability to increase the amount available to be factored or to take on additional debt so as to

create additional liability for NBN.   See email correspondence dated December 21-22, 2015,

attached to the Maddox-Dorsey Decl. as **Appendix C**.

47.     While the Debtor, its parent, and affiliates continued to loot AURN, the

Debtor caused AURN to withhold and defer payments of affiliate compensation owed to radio

station affiliates around the country.  In the simplest terms, the Debtor abused its control of

AURN to pay itself ahead of affiliate compensation payments to these affiliate radio stations.  As

a result of these unilateral and self-interested actions of the Debtor, the Debtor has caused

damage to AURN's business reputation and affiliate relations that have negatively affected the

financial condition, profitability, goodwill and value of AURN's ongoing business.

48.     Additionally:  (i) despite the Debtor's contractual commitment to do so,

the Debtor has not provided nor caused AURN to provide to NBN any monthly financial

statements for AURN for any month since May 2015 even though an AURN employee is paid to

prepare them; (ii) in the past five to six months, as a result of the Debtor's mismanagement and

abuse of its control, two employees in AURN's accounting department have resigned their

employment and one has taken medical leave due to work-related stress; (iii) AURN's monthly

sales of commercial advertising are down markedly for January and February 2016 as compared

to the same time frame in 2015; and (iv) the Debtor has caused AURN to improperly withhold

funds collected by AURN for the benefit of SupeRadio (an affiliate of NBN's parent

corporation) pursuant to a sales representative contract.

49.    Most significantly and incredibly, upon review of the Debtor's voluntary

petition and the Debtor's list of the 20 largest unsecured claims, NBN has determined that

virtually all of the listed creditors and unsecured claims (apart from the Debtor's trial and other

litigation counsel)[2] relate to providers of programming for which the Debtor has taken hundreds

of thousands of dollars in monthly advances from AURN supposedly to pay on a monthly basis

for more than eight years.  To the extent that the Debtor failed to pay these service providers and

contractors monies that the Debtor took from AURN as advances, it only reinforces the fact that

the Debtor has been looting the AURN partnership of its funds without legitimate justification.

The effect of this financial thievery has been to negatively affect the value of the asset that the

Debtor pledged as consideration for the settlement agreement.  Each day that passes without

relief potentially enables the Debtor, its parent, and their representatives to deplete, impair, and

damage the unique partnership interest that NBN should have received on March 1, 2016.

50.    Moreover, immediate relief is particularly critical because AURN and

NBN are at a substantial risk today and early next week of having the Debtor secretly use the

assets of AURN to be factored in order to obtain funds from Triumph via the factoring loan that

the Debtor would cause to pay to itself, or its parent or affiliates.  Today, on March 4, 2016,

NBN learned that the Debtor at the behest of the Davenports is attempting to factor AURN's

February 2016 accounts receivables in order to obtain additional cash to be extracted from

---

[2] It is noteworthy that the Debtor was not the only Defendant in the District Court litigation.
Davenport Sr., Davenport Jr. and Jerry Lopes were named as individual defendants based upon
their aiding and abetting the Debtor's breach of its fiduciary duties.  Accordingly, trial
counsel's fees were jointly and severally owed by the Debtor and these individual defendants.

AURN.  Such accounts receivables were not collected or factored as of March 1, 2016, and thus

became the property of NBN as a result of the automatic and immediate transfer of the majority

partnership interest.  By its actions, including those it is currently engaged in, the Debtor is

effectively using its control of AURN and the shield of the automatic stay to continue its pattern

and practice of looting the AURN partnership while frustrating NBN's ability to enforce and

compel specific performance of the settlement agreement.

51.     In the absence of immediate relief from the automatic stay to allow NBN

to enforce the terms of the Settlement Agreement, NBN believes that the Debtor will continue to

cause irreparable damage to AURN and impair the value of the majority partnership interest in

AURN, which NBN now owns under the terms of the Settlement Agreement.

### RELIEF REQUESTED

52.     By this Motion, NBN respectfully requests that the Court (i) enter an

order, substantially in the form attached hereto as **Exhibit A**, granting emergency relief from the

automatic stay pursuant to section 362(d) of the Bankruptcy Code to allow NBN to enforce the

terms of the Settlement Agreement against the Debtor in proceedings pending in the District

Court, including, without limitation, if authorized by the District Court, taking title to (if

necessary), and possession of, and exercising control over, all partnership interests in AURN in

accordance with the terms of the Settlement Agreement, and (ii) enter an order, substantially in

the form attached hereto as **Exhibit B**, shortening the applicable notice period and scheduling an

expedited pre-trial conference and evidentiary hearing as soon as possible to consider the

substantive relief requested in this Motion.

## BASIS FOR REQUESTED RELIEF

53.     Section 362(d)(1) of the Bankruptcy Code provides that the Court "shall"

grant relief from the stay "for cause." 11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not

define "cause."  However, courts have interpreted section 362(d)(1) to include a broad set of

circumstances constituting "cause" for stay relief.  See, e.g., In re Texas State Optical, Inc., 188

B.R. 552, 556 (Bankr. E.D. Tex. 1995) (citing In re Sentry Park, Ltd., 87 B.R. 427, 430 (Bankr.

W.D. Tex. 1988) ("Cause" is an intentionally broad and flexible concept that permits the

Bankruptcy Court, as a court of equity, to respond to inherently fact-sensitive situations)); 3

COLLIER ON BANKRUPTCY ¶ 362.07[3][a], at 362-84.19 (15th ed. rev. 2005).

54.     Whether cause exists is determined on a case-by-case basis based on the

totality of the circumstances.  In re Chandler, 441 B.R. 452, 463 (Bankr. E.D. Pa. 2010) (citing

Baldino v. Wilson (In re Wilson), 116 F.3d 87, 90 (3d Cir. 1997)).  The determination is an

"equitable determination" that requires the Court to engage in a "fact-sensitive inquiry" as to the

balance of hardships.  Chandler, 441 B.R. at 463.  In doing so, the Court "may consider the

policies reflected in the bankruptcy code, and the interests of the debtor, other creditors and any

other interested parties."  In re Brown, 311 B.R. 409, 413 (E.D. Pa. 2004). The decision to lift

the stay is discretionary with the bankruptcy judge, and may be reversed only upon a showing of

abuse of discretion.  Matter of Mendoza, 111 F.3d 1264, 1266 (5th Cir. 1997); In re Dixie

Broadcasting, Inc., 871 F.2d 1023, 1026 (11th Cir. 1989).

I.     **"Cause" Exists To Lift The Automatic Stay Because The Debtor's Chapter 11
       Petition Was Filed In Bad Faith.**

55.     The Debtor filed this chapter 11 case without any genuine reorganization

purpose solely as a litigation tactic to frustrate NBN's legitimate right to enforce the terms of the

Settlement Agreement.  Accordingly, this case was filed in bad faith and "cause" exists to lift the automatic stay.

56.      "Filing bankruptcy in bad faith is 'cause' for relief under [Bankruptcy] Code § 362(d)(1)."  In re Conference of African Union First Colored Methodist Protestant Church, 184 B.R. 207, 218 (Bankr. D. Del. 1995) (citing In re Dixie Broadcasting, Inc., 871 F.2d 1023, 1027 (11th Cir. 1989), cert. denied, 493 U.S. 853 (1989)); accord In re Trident Assocs. Ltd. P'ship, 52 F.3d 127, 131 (6th Cir. 1995), cert. denied, 516 U.S. 869 (1995) (upholding bankruptcy court's decision to lift automatic stay and dismiss petition because petitioner filed in bad faith to isolate insolvent property and its creditors on the eve of foreclosure); In re Lippolis, 228 B.R. 106, 112 (E.D. Pa. 1998) (stay relief granted based upon debtor's bad faith filing); Sterling Bank & Trust v. Merchant (In re Merchant), 256 B.R. 572, 577 (Bankr. W.D. Pa. 2000) (finding bad faith filing can constitute "cause" for relief from the stay and noting it is an "abuse of § 362 . . . when a debtor has no intention of effectuating a realistic plan of reorganization"). Any finding of bad faith is a factual determination that will be upheld on appeal absent a finding of clear error.  See In re Smith, 286 F.3d 461, 465 (7th Cir. 2002).

57.      In the Third Circuit, the "burden is on the bankruptcy petitioner to establish good faith." 15375 Mem'l Corp. v. BEPCO, LP, 589 F.3d 605, 618 (3d Cir. 2009); see also 11 U.S.C. § 362(g)(2).  "Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" 15375 Mem'l Corp., 589 F.3d at 618 (quoting In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3d Cir. 2004)).

58.     Courts should focus on two inquiries that are relevant to whether the

debtor filed its petition in good faith:  "(1) whether the petition serves a valid bankruptcy purpose

and (2) whether the petition is filed merely to obtain a tactical litigation advantage."  15375

Mem'l Corp., 589 F.3d at 618 (quoting Integrated Telecom, 384 F.3d at 119-120).  The

following factors are relevant to these inquiries:  (a) single asset case; (b) few unsecured

creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two

party dispute which can be resolved in pending state court action; (f) no cash or income; (g) no

pressure from non-moving creditors; (h) previous bankruptcy petition; (i) prepetition conduct

was improper; (j) no possibility of reorganization; (k) debtor formed immediately prepetition;

(l) debtor filed solely to create automatic stay; and (m) subjective intent of the debtor.

Primestone Inv. Partners LP v. Vornado PS, LLC (In re Primestone Inv. Partners LP), 272 B.R.

554, 557 (D. Del. 2002) (citing In re SGL Carbon Corp., 200 F.3d 154, 165 (3d Cir. 1999); In re

Phoenix Piccadilly, Ltd., 849 F.2d 1393, 1394-95 (11th Cir. 1988); In re SB Properties, 185 B.R.

198, 205 (E.D. Pa. 1995)).  "[N]o single factor is determinative of a lack of good faith in filing a

petition."  Primestone, 272 B.R. at 558.

59.     An analysis of these factors supports a finding that the Debtor filed its

petition in bad faith.

60.     Single asset case.  Upon information and belief, the Debtor's sole asset

with any significant value is its 51% partnership interest in AURN.  This asset was scheduled to

be transferred to NBN on March 1, 2016—the same day that the Debtor filed this case.

61.     Few unsecured creditors.  Upon information and belief, the Debtor has

few unsecured creditors.  Only 32 entities are identified on the Debtor's creditor matrix.  Further,

as indicated on the list of the top 20 unsecured creditors filed with the Debtor's petition, the

Debtor has only $301,752.31 in unsecured debts that are unrelated to the Settlement Agreement

and the District Court litigation.  Virtually all of these debts (apart from trial or legal counsel)

constitute "programming expenses" that the Debtor already has withdrawn funds from AURN

ostensibly for the purpose of paying these debts.  Given that the top 20 list of unsecured creditors

encompasses all debts in excess of $600.00, it is reasonable to conclude that the Debtor's

unsecured creditor body (unaffiliated with the District Court litigation) holds less than

$350,000.00 in total debt.

        62.     <u>Petition filed on eve of foreclosure</u>.  This is not a foreclosure case, but the

underlying principle remains applicable.  The Debtor filed this case to frustrate NBN's legitimate

right to enforce the Settlement Agreement in the District Court.  At approximately 2:00 p.m. on

March 1, 2016, the District Court issued an order setting an emergency status conference and

evidentiary hearing on Wednesday, March 2, 2016, at 11:00 a.m., to address an anticipated

motion filed by NBN to enforce the Settlement Agreement.  <u>See</u> Doc. No. 205.  Approximately

two and a half hours later on March 1, 2016, the Debtor filed its voluntary petition for relief

under chapter 11 of the Bankruptcy Code.

        63.     <u>Two party dispute which can be resolved in pending state court action</u>.  In

light of the Extension Letter and the timing of the filing, it is clear that this chapter 11 case was

filed solely to obtain the protections of the Bankruptcy Code and stay NBN from enforcing the

terms of the Settlement Agreement, and the vast majority of this case, if it is permitted to

proceed, will revolve around a resolution of NBN's and the Debtor's dispute as to which entity is

entitled to the majority partnership interest in AURN—the Debtor's sole asset of any significant

value.  The Debtor filed this case in an attempt to gain leverage and, ultimately, resolve a two-

party dispute between the Debtor and NBN.  However, this dispute may be resolved fairly and

efficiently in the pending proceeding before the District Court.

       64.   <u>No cash or income</u>.  Upon information and belief, the only cash or income

generated by the Debtor is the cash and income that is distributed or paid to the Debtor by

AURN at the Debtor's direction.  As set forth in detail in this Motion, a large portion of these

payments are unjustified and improper.

       65.   <u>Prepetition conduct was improper</u>.  The Debtor has used and is using its

control of AURN to siphon funds from the partnership to subsidize and prop up Sheridan's

operations.  Prior to the Petition Date, the Debtor improperly extracted from AURN in excess of

$6,000,000 without providing any reasonably equivalent value in exchange.  In doing so, the

Debtor has totally disregarded its fiduciary duties to NBN.

       66.   <u>No possibility of reorganization</u>.  Upon information and belief, the Debtor

has no going concern value to reorganize.  Under the Settlement Agreement, the Debtor has lost

its ability to purchase NBN's minority partnership interest in AURN, and title to the majority

partnership interest in AURN vested immediately and automatically in NBN when the Debtor

failed to make Payment Three on March 1, 2016.  <u>See</u> <u>In re Mason</u>, 1999 WL 60145, *3 (Bankr.

E.D. Pa. Jan. 29, 1999) ("Under Pennsylvania law, a grantor retains title to property placed in

escrow until occurrence of the condition, at which point title vests with the grantee irrespective

of whether delivery by the escrow agent has occurred.").   As a result, the Debtor has nothing left

to reorganize.

       67.   <u>Debtor filed solely to create automatic stay</u>.  Under the Settlement

Agreement, one of two things was required to occur on March 1, 2016:  the Debtor was required

to (i) make Payment Three to NBN or (ii) transfer its majority partnership interest in AURN to

NBN "immediately and forthwith." The Debtor was unable to raise sufficient capital to make

Payment Three on a timely basis, so it requested an extension of time from NBN to make

Payment Three. NBN refused to provide an extension of time because the Settlement Agreement

was intended to effectuate a complete "divorce" of the partnership by no later than March 1,

2016. Without sufficient funds or an agreed extension, and in light of the imminent evidentiary

hearing to enforce the Settlement Agreement, the Debtor filed its voluntary petition solely to

obtain the benefit of the automatic stay and to stall NBN from enforcing the Settlement

Agreement and the transfer of possession of the majority partnership interest in AURN from the

Debtor to NBN. This is an improper use of the Bankruptcy Code. "[C]ourts universally demand

more of Chapter 11 petitions than a naked desire to stay pending litigation, and any perceived

benefit of the automatic stay, without more, cannot convert a bad faith filing to a good one."

15375 Mem'l Corp., 589 F.3d at 620.

68. Subjective intent of the debtor. The Debtor's subjective intent in filing

this chapter 11 case is evident from counsel's statements made in the Extension Letter. Counsel

threatened to file a chapter 11 petition unless NBN agreed to an extension of the time to make

Payment Three to NBN. See Maddox-Dorsey Decl. Appx. C. The only reasonable interpretation

of counsel's comments is that the Debtor filed this chapter 11 case solely to buy additional time

and prevent NBN from enforcing the terms of the Settlement Agreement.

69. Considering all of these factors collectively, the Debtor's chapter 11

petition does not serve a valid bankruptcy purpose, such as preserving a going concern or

maximizing the value of the debtor's estate, but instead was filed primarily as a litigation tactic

to avoid enforcement of the Settlement Agreement. "Where the timing of the filing of a Chapter

11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing

was a litigation tactic," the Court may conclude that the petition was filed in bad faith.  See

15375 Mem'l Corp., 589 F.3d at 625 (citing SGL Carbon Corp., 200 F.3d at 165).  In the instant

case, there can be no doubt; this chapter 11 case was filed solely as a litigation tactic to frustrate

NBN's legitimate right to enforce the Settlement Agreement.  Accordingly, "cause" exists for the

Court to grant NBN relief from the automatic stay.

## II.    "Cause" Exists To Grant Relief From the Automatic Stay Because The Debtor Should Not Be Permitted To Continue Looting AURN To The Detriment Of NBN.

70.    Viewing the totality of the circumstances, equitable considerations and the

balance of hardships weigh strongly in favor of granting relief from the automatic stay.

71.    First, under the terms of the Settlement Agreement, the Debtor has no

legal or contractual right after March 1, 2016, (i) to purchase NBN's minority partnership

interest in AURN or (ii) to own, possess, or control the majority partnership interest in AURN.

The Debtor's opportunity to purchase NBN's minority partnership interest has lapsed pursuant to

the terms of the Settlement Agreement, and nothing in the Bankruptcy Code acts to toll that

contractual deadline or resuscitate contractual rights that have lapsed.  Further, all rights to own,

possess, and control the majority partnership interest in AURN vested in NBN when the Debtor

failed to make Payment Three on March 1, 2016.  See In re Mason, 1999 WL 60145, *3 (Bankr.

E.D. Pa. Jan. 29, 1999) ("Under Pennsylvania law, a grantor retains title to property placed in

escrow until occurrence of the condition, at which point title vests with the grantee irrespective

of whether delivery by the escrow agent has occurred.").  Nothing in the Bankruptcy Code

prevents the parties' agreement from taking effect pursuant to its terms or alters the terms of the

Settlement Agreement.  Accordingly, the only material obligation remaining under the

Settlement Agreement is for the Debtor and its escrow agent to transfer possession and control

over the majority partnership interest to NBN.

72.     Second, even assuming, *arguendo*, that legal title to the majority partnership interest remains property of the estate, the majority partnership interest in AURN is a unique asset, NBN is entitled to the equitable remedy of specific performance, and an award of monetary damages is not a viable alternative.  Consequently, the Debtor's non-monetary obligation to transfer its majority partnership interest to NBN is not a "claim" and cannot be discharged under the Bankruptcy Code.  See, e.g., Abboud v. The Ground Round, Inc. (The Ground Round, Inc.), 335 B.R. 253, 263 (B.A.P. 1st Cir. 2005) (holding that right to specific performance under lease does not constitute a claim and cannot be discharged); see also 11 U.S.C. § 101(5).  Further, even if the Settlement Agreement is deemed to be an executory contract (which it is not), rejection of the Settlement Agreement by the Debtor would not avoid the Debtor's obligation to transfer its majority partnership interest to NBN.  See id. at 261 ("[A] party is entitled to specific performance of a rejected contract if such a remedy is clearly available under applicable state law.").  Accordingly, the majority partnership interest in AURN must be transferred to NBN at some point in time.  The Debtor should not be permitted to use this chapter 11 case merely to stall the inevitable, while at the same time impairing or destroying the value remaining in AURN.

73.     Third, for many years, the Debtor has transferred the overwhelming majority of Sheridan's corporate overhead to AURN under the guise of charges for G&A expenses and used its control of the partnership to force AURN to make these excessive and unjustified related-third party payments to the Debtor.  To date, the Debtor has forced AURN to make payments to the Debtor in excess of $6,000,000 without giving any reasonably equivalent value in exchange.  Such behavior continues to this day.  If relief from stay is not granted expeditiously, NBN is gravely concerned that the Debtor will continue (i) diverting AURN's

funds improperly to pay for Sheridan's corporate overhead, (ii) use AURN's factoring loan to factor receivables of AURN, (iii) increasing AURN's debt without any attendant benefit to AURN.  Any and all of these activities will impair the value of AURN and, potentially, cause valuable employees to leave.  NBN should not be forced to stand by and watch the Debtor eviscerate AURN's value.

74.     The time has come for the Debtor to stop taking advantage of AURN and NBN.  NBN has suffered through the Debtor's mismanagement of AURN for more than eight years; the parties were involved with the District Court litigation for more than three years; and NBN has waited patiently while the Debtor has attempted to gain sufficient capital to purchase NBN's minority partnership interest in AURN under the parties' Settlement Agreement. Conversely, the Debtor has had more than a fair opportunity to act in compliance with the parties' Partnership Agreement and to purchase NBN's minority partnership interest pursuant to the parties' own Settlement Agreement.  The Debtor ran out of time on March 1, 2016.  The Debtor should not be permitted to use this chapter 11 case as a sword to hold AURN hostage while the Debtor continues to diminish the value of AURN to NBN's detriment.  The Bankruptcy Court should grant relief from the stay so that the District Court may enforce the parties' freely bargained-for partnership divorce.

## NEED FOR EMERGENCY RELIEF

75.     It is imperative that an expedited hearing be held on the Motion to avoid the irreparable harm that would most assuredly result if this matter was adjudicated under the timeframes of the Court's regular docket.

76.     The value of the majority partnership interest in AURN (as well as NBN's minority partnership interest) will decline rapidly in value if the Debtor is permitted to continue looting AURN for its own benefit and the benefit of its affiliates.

77.     The need for an expedited hearing has not been caused by any lack of due diligence on the part of NBN or its counsel, but has been brought about solely by circumstances beyond their control, namely, the bad faith filing of this chapter 11 case on the same day that the Settlement Agreement required the transfer of possession of property from the Debtor to NBN and the Debtor's continued efforts to drain AURN of cash through unjustified related-party transactions.

78.     For these reasons and others set forth in the Motion, the Court should schedule an expedited hearing to consider the relief requested in this Motion.

## NO PRIOR REQUEST

79.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, NBN respectfully requests that this Court (i) enter an order, substantially in the form attached hereto as **Exhibit A**, granting (a) emergency relief from the automatic stay pursuant to section 362(d) of the Bankruptcy Code to allow NBN to enforce the terms of the Settlement Agreement against the Debtor in proceedings pending in the District Court, including, without limitation, if authorized by the District Court, taking title to (if necessary), and possession of, and exercising control over, all partnership interests in AURN in accordance with the terms of the Settlement Agreement, and (b) such other and further relief as may be just and proper, and (ii) enter an order, substantially in the form attached hereto as **Exhibit B**, shortening the applicable notice period and scheduling an expedited pre-trial

conference and evidentiary hearing as soon as possible to consider the substantive relief

requested in this Motion.

Dated:  March 4, 2016                              Respectfully submitted,

                                                  REED SMITH LLP

                              By:    /s/ Luke A. Sizemore
                                     Roy W. Arnold (PA ID No. 70544)
                                     Luke A. Sizemore (PA ID No. 306443)
                                     225 Fifth Avenue, Suite 1200
                                     Pittsburgh, PA 15222
                                     Telephone:  (412) 288-3131
                                     Facsimile:  (412) 288-3063
                                     Email:  rarnold@reedsmith.com
                                     Email:  lsizemore@reedsmith.com

                                     *Counsel to NBN Broadcasting, Inc.*