**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: | Chapter 11 |
| SHERIDAN BROADCASTING NETWORKS, INC., | Case No. 16-20722 (TPA) |
| Debtor. | |
| NBN BROADCASTING, INC., | |
| Movant, | Document No. _____ |
| v. | Related to Document. No. _____ |
| SHERIDAN BROADCASTING NETWORKS, INC., | |
| Respondent. | |

**DECLARATION OF CHESLEY MADDOX-DORSEY IN SUPPORT OF
THE MOTION OF NBN BROADCASTING, INC. FOR RELIEF FROM THE
AUTOMATIC STAY TO ENFORCE THE TERMS OF A SETTLEMENT
AGREEMENT BETWEEN NBN BROADCASTING, INC. AND SHERIDAN
BROADCASTING NETWORKS, INC. IN THE UNITED STATES DISTRICT
<u>COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA</u>**

I, Chesley Maddox-Dorsey, hereby declare under penalty of perjury:

1. I am the Chief Executive Officer of Access.1 Communications Corp. and President of its subsidiary, NBN Broadcasting, Inc. ("<u>NBN</u>").

2. I submit this declaration to assist the Court and other parties in interest in understanding the factual circumstances that support the relief requested in the *Motion of NBN Broadcasting, Inc. For Relief From the Automatic Stay To Enforce the Terms of a Settlement Agreement Between NBN Broadcasting, Inc. and Sheridan Broadcasting Network, Inc. in the United States District Court for the Western District of Pennsylvania.*

3. Except as otherwise indicated herein, all facts set forth in this declaration are based on my personal knowledge, information supplied to me by other members of NBN's management or NBN's professionals, my knowledge of the relevant documents, or my opinion based on my experience, knowledge, and information concerning AURN's financial condition. If called upon to testify, I would testify competently to the facts set forth in this declaration. I am authorized to submit this declaration on behalf of NBN.

A. **The Parties And The Partnership**

4. The AURN general partnership was formed on December 13, 1991, when the Debtor and NBN entered into a written Partnership Agreement.

5. NBN is a New York Corporation that has been the minority partner in AURN with a 49% ownership interest since AURN's formation pursuant to a written Partnership Agreement. I am the President of NBN.

6. The Debtor is a Pennsylvania corporation that is a wholly owned subsidiary of Sheridan Broadcasting Corporation ("Sheridan"). The Debtor has been the majority partner in AURN with a 51% ownership interest since AURN's formation pursuant to the Partnership Agreement. Sheridan is owned by the Davenport family, with Ronald Davenport Sr. and his wife Judith Davenport holding approximately 90% of the shares and his three adult children, including Ronald Davenport Jr., holding the remaining 10% of Sheridan's shares. Davenport Sr. is the founder, chairman, and chief executive officer of Sheridan. Davenport Sr. also serves as one of the Debtor's representatives on the AURN management committee.

7. AURN is a radio broadcasting network. Broadcasting networks organize groups of affiliated radio stations that are often dispersed over a large geographic area, typically nationwide. The network purchases blocks of advertising time from the affiliated radio stations.

The network then resells the advertising time that it has purchased to national advertisers. Networks function to allow national advertisers to efficiently place advertisements on radio stations without expending the time and effort of negotiating the purchase of time with each individual station. The network, when it resells the time to advertisers, marks up the price that it originally paid the affiliated radio stations. A network's revenue comes from the mark-up on the advertising time it has purchased when it is sold to the national advertisers. Payment is made in the following order: an advertiser paying AURN for the contracted advertising time and AURN subsequently paying a portion of that money to the affiliate for the purchased time.

8. The Partnership Agreement created the process by which the partners would manage AURN. Pursuant to its terms, AURN is managed by a management committee, which normally consists of two NBN representatives and two Debtor representatives. The management committee also has a vacant fifth seat, which may be filled by Davenport Sr. in the event of a tied vote. This power to appoint a fifth member gives the Debtor control of the management committee and of AURN. A true and correct copy of the Partnership Agreement is attached hereto as **Appendix A**.

B.    **Illusory G&A Allocation Charges**

9. The Partnership Agreement provides that the partners may provide certain network programming to AURN, and that AURN will reimburse the partners for the "actual costs" of providing programming to the partnership. See Appx. A.

10. The Debtor, through its affiliates, provides programing to AURN and seeks payment from AURN on a monthly basis for the actual costs in providing such programming. In addition to invoicing AURN for the actual costs in providing programming to AURN, the Debtor also invoices AURN for a number of other categories of costs that are

unrelated to the provision of programming. The largest of these other categories is listed in the Debtor's invoices as the "G&A Allocation" line item. Since 2008, this G&A allocation amount has been the highest component of charges that the Debtor assessed to AURN. The G&A allocation regularly exceeds the costs that the Debtor charges AURN for its programming expenses. Despite the size of the G&A allocation (which is often more than $140,000 a month), the Debtor failed to disclose or justify its secret methodology for allocating its parent's corporate overhead to AURN. The evidence at the hearing will show that the G&A allocation line item is a related-party payment that goes to cover almost all of Sheridan's corporate overhead, including the $500,000 annual "salary" of Davenport Sr.

11. Additionally, although the Debtor only provided invoices to AURN some six to eight weeks after the end of the particular month, the Debtor nonetheless forced AURN to pay it at the beginning of each month, thereby advancing itself funds before incurring any actual expenses for the coming month. Through May 2015, the Debtor took significantly more money through advances than it accounted for through monthly invoices, and since May 2015, the Debtor has not accounted for the substantial monthly advances at all. In other words, the Debtor regularly failed to credit AURN for the amounts that it previously received from AURN in excess of the purported "actual costs" in its subsequent invoices to AURN. The failures to account for differences and credit AURN for any surpluses paid highlight that the related-party transactions at issue here are wholly unrelated to services that the Debtor allegedly provides to AURN.

12. As a result of these improper practices, the Debtor received a total of $4,704,322.67 of payments from AURN in 2012, $3,300,000.00 of payments from AURN in each of 2013 and 2014, and $4,125,000.00 of payments from AURN in 2015. Of these amounts,

at least $5,993,513.00 was attributable to unjustified G&A allocations. The actual total G&A allocation likely is much more, but NBN has been unable to track G&A allocations after May 2015 because the Debtor stopped issuing invoices to AURN altogether. Even without invoices, however, monthly advances from AURN to the Debtor have continued at a rate of $250,000 to $300,000 per month through February 2016. The Debtor's extracting such a significant amount of money from AURN has resulted in sharply reduced funds available for distribution and harm to NBN.

### C.     The District Court Litigation And Settlement Agreement

13.     On March 20, 2012, NBN commenced an action against the Debtor in the District Court seeking damages for breaches of the Debtor's fiduciary duties to NBN. See NBN Broadcasting, Inc. v. Sheridan Broadcasting Networks, Inc., *et al.*, Civil Action No. 12-346, Doc. No. 1 (W.D. Pa.).

14.     On October 20, 2015, counsel for the parties selected a jury and delivered opening statements in the trial in the District Court litigation. Doc. Minute Entry dated October 20, 2015.

15.     On October 23, 2015, after two days of evidence during NBN's case-in-chief and with the aid of the District Court and its law clerk, the parties reached a confidential settlement agreement ("Settlement Agreement") resolving all claims in the District Court action and any related litigation between the parties, including any parallel state court litigation. See Doc. Nos. 194, 196.

16.     The Settlement Agreement was reached through negotiations during mediation sessions dating back to at least May 2015 that were overseen by the District Court's law clerk who served as mediator. See Doc. Nos. 121, 128-30, 131-32, 133, 135, 137-38.

17. The material terms of the Settlement Agreement are set forth in a sealed transcript of Court proceedings dated October 23, 2015.  <u>See</u> Doc. No. 196.

18. There is no dispute that the Settlement Agreement exists.  The Settlement Agreement was reached through court-assisted mediation and the terms were described on the record before the jury was released.

19. Generally, the Settlement Agreement contemplated a partnership "divorce" and complete separation on or before March 1, 2016, whereby either the Debtor or NBN would acquire the entire AURN partnership through the automatic and immediate transfer of the other partner's partnership interest being held in escrow by the parties' respective trial counsel.

20. Pursuant to the Settlement Agreement, the Debtor was given an opportunity or option to purchase NBN's minority partnership interest in AURN by making three payments to NBN of varying amounts on or before:  (i) October 31, 2015 ("<u>Payment One</u>"); (ii) December 31, 2015 ("<u>Payment Two</u>"); and (iii) March 1, 2016 ("<u>Payment Three</u>").  Upon timely completion of the third payment, NBN's minority partnership interest transfers automatically and immediately to the Debtor.  The parties expressly agreed that the right to make Payment Three lapsed on March 1, 2016, without any cure period.

21. Conversely, if the Debtor chose not to exercise its option to purchase NBN's minority partnership interest by failing to make one or more of the three payments by the applicable deadline, the Debtor's majority partnership interest transfers automatically and immediately to NBN as consideration for the dismissal and release of claims against the Debtor.

22. The parties' trial counsel are required to hold the parties' respective partnership interests in escrow to facilitate the automatic and immediate transfer of NBN's

minority partnership interest to the Debtor (in the event of timely financial performance by the Debtor) or the Debtor's majority partnership interest to NBN (in the event of a failure to make one or more of the payments by the applicable deadline).

23.     In sum, in exchange for the dismissal and release of NBN's claims, including NBN's substantial claims for compensatory and punitive damages against the Debtor and the individual defendants, the Debtor was required to tender the sum of all three payments or its 51% partnership interest in AURN on or before March 1, 2016.

**D.     Breach Of Settlement Agreement**

24.     On February 24, 2016, NBN's counsel received a letter (the "Extension Letter") from the Debtor's counsel stating in pertinent part:  "Our client is requesting an extension to tender the final payment due under the agreement reached before Judge Cercone. Please also be advised that our client has authorized us to file a Petition under Chapter 11 of the Bankruptcy Code if an extension is not granted."  A true and correct copy of the Extension Letter is attached hereto as **Appendix B**.

25.     Consistent with the parties' settlement terms and goal of accomplishing a complete "divorce" of the partnership by no later than March 1, 2016, NBN did not grant the Debtor an extension of time to make the final payment.

26.     On March 1, 2016, the Debtor failed to make Payment Three pursuant to the terms of the Settlement Agreement, and expressly no right exists to make this payment after March 1, 2016.

27.     By the Debtor's failure to make Payment Three on March 1, 2016, legal title to the majority partnership interest in AURN immediately and automatically vested in NBN by operation of the Settlement Agreement and without any further or affirmative action by either

party. Accordingly, the Debtor no longer has any right to own, possess, or control any interest in AURN or to participate in or conduct AURN's ongoing business.

28. The Debtor and its escrow agent also failed to transfer possession of the Debtor's majority partnership interest in AURN to NBN on March 1, 2016.

29. The Debtor's failure to make Payment Three or immediately transfer possession of the Debtor's majority partnership interest in AURN to NBN on March 1, 2016, is a material breach and default under the clear and essential terms of the Settlement Agreement.

E. **The Debtor's Pattern and Practice of Abusing Its Control of AURN Has Continued After The Settlement Agreement and Has Caused AURN's Employees to Depart, Affiliate Compensation Arrearages to Grow, Sales to Decline, and Financial Condition to Worsen, Thereby Impairing the Value of AURN.**

30. To effect Payment One, on October 27, 2015, the Debtor caused AURN to issue a check in the amount of Payment One to the Debtor. After depositing the AURN check made payable to the Debtor, the Debtor then issued a check payable to NBN in the amount of Payment One. The Debtor did not cause AURN to declare a distribution in connection with the issuance of the October 27, 2015 check, nor was the October 27, 2015 check issued to reimburse any expenses incurred on behalf of AURN. Without declaring a distribution in accordance with the terms of the Partnership Agreement and without any evidence that the check was paying any expense of AURN, the Debtor continued its pattern and practice of looting AURN to serve its own financial interests.

31. In fact, the Debtor continued its practice of causing AURN to make related-party payments to the Debtor each and every month since October 2015. In October 2015, along with the amount of Payment One, the Debtor caused AURN to issue checks to the Debtor and its affiliates in the amount of $296,000 for a total of $796,000. In November 2015, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling $346,000. In

December 2015, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling $296,000 and an unauthorized wire transfer to the Debtor in the amount of $625,000 (which the Debtor apparently used to fund its obligation to make Payment Two on or about December 31, 2015).[1] In January 2016, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling $296,000. In February 2016, the Debtor caused AURN to issue checks to the Debtor and its affiliates totaling at least $171,000. In the aggregate, since June 2015, the Debtor has caused AURN to pay the Debtor and its affiliates more than $3.7 million in related-party payments.

32. In addition to forcing AURN to continue making unjustified related-party payments to the Debtor, the Debtor attempted to cause AURN to incur an additional $1.5 million of debt pursuant to a factoring loan to be supplied by Triumph Commercial Finance ("Triumph"), which previously provided a factoring loan in June 2015. Upon information and belief, the Debtor was attempting to cause AURN to incur this additional debt to enable the Debtor to use the proceeds of the new factoring loan to make Payment Two or Payment Three. In doing so, the Debtor was improperly attempting to finance the purchase of the minority partnership interest by creating a partnership debt and a potential liability to NBN—in violation of the terms of the Settlement Agreement itself.

33. In attempting to increase the factoring loan limit, the Debtor attempted to conceal its lack of authority to cause AURN to incur additional factoring loan debt by manufacturing fictitious meeting minutes. The Debtor did so by purportedly convening an AURN "management committee" meeting on December 21, 2015, without providing any prior

---

[1] This wire payment was made in violation of the Partnership Agreement, which requires that withdrawals of partnership funds be done by checks that are co-signed by representatives of each partner.

notice of the meeting to NBN's representatives on the AURN Management Committee, even though NBN continued to be a 49% partner in AURN, the Partnership Agreement continued to govern the AURN partnership, and the Settlement Agreement only provided the Debtor with operational control of Sheridan until March 1, 2016. After he illegally convened this purported meeting, Davenport Jr. sent an email dated December 21, 2015, to me stating that "the AURN management committee held a special meeting at 2 pm in order to ratify all actions taken to increase the amount available by AURN to be factored by Triumph from $2,000,000 to $3,500,000." Copying Triumph's representatives, NBN responded to Davenport Jr. and the Debtor on December 22, 2015 explaining that the Debtor had no authority or ability to increase the amount available to be factored or to take on additional debt so as to create additional liability for NBN. A true and correct copy of the email correspondence dated December 21-22, 2015 is attached hereto as **Appendix C**.

34. While the Debtor, its parent, and affiliates continued to loot AURN, the Debtor caused AURN to withhold and defer payments of affiliate compensation owed to radio station affiliates around the country. In the simplest terms, the Debtor abused its control of AURN to pay itself ahead of affiliate compensation payments to these affiliate radio stations. As a result of these unilateral and self-interested actions of the Debtor, the Debtor has caused damage to AURN's business reputation and affiliate relations that have negatively affected the financial condition, profitability, goodwill and value of AURN's ongoing business.

35. Additionally: (i) despite the Debtor's contractual commitment to do so, the Debtor has not provided nor caused AURN to provide to NBN any monthly financial statements for AURN for any month since May 2015 even though an AURN employee is paid to prepare them; (ii) in the past five to six months, as a result of the Debtor's mismanagement and

abuse of its control, two employees in AURN's accounting department have resigned their employment and one has taken medical leave due to work-related stress; (iii) AURN's monthly sales of commercial advertising are down markedly for January and February 2016 as compared to the same time frame in 2015; and (iv) the Debtor has caused AURN to improperly withhold funds collected by AURN for the benefit of SupeRadio (an affiliate of NBN's parent corporation) pursuant to a sales representative contract.

36. Most significantly and incredibly, upon review of the Debtor's voluntary petition and the Debtor's list of the 20 largest unsecured claims, NBN has determined that virtually all of the listed creditors and unsecured claims (apart from the Debtor's trial and other litigation counsel)[2] relate to providers of programming for which the Debtor has taken hundreds of thousands of dollars in monthly advances from AURN supposedly to pay on a monthly basis for more than eight years. To the extent that the Debtor failed to pay these service providers and contractors monies that the Debtor took from AURN as advances, it only reinforces the fact that the Debtor has been looting the AURN partnership of its funds without legitimate justification. The effect of this financial thievery has been to negatively affect the value of the asset that the Debtor pledged as consideration for the settlement agreement. Each day that passes without relief potentially enables the Debtor, its parent, and their representatives to deplete, impair, and damage the unique partnership interest that NBN should have received on March 1, 2016.

37. Moreover, immediate relief is particularly critical because AURN and NBN are at a substantial risk today and early next week of having the Debtor secretly use the assets of AURN to be factored in order to obtain funds from Triumph via the factoring loan that

---

[2] It is noteworthy that the Debtor was not the only Defendant in the District Court litigation. Davenport Sr., Davenport Jr. and Jerry Lopes were named as individual defendants based upon their aiding and abetting the Debtor's breach of its fiduciary duties. Accordingly, trial counsel's fees were jointly and severally owed by the Debtor and these individual defendants.

the Debtor would cause to pay to itself, or its parent or affiliates. Today, on March 4, 2016, NBN learned that the Debtor at the behest of the Davenports is attempting to factor AURN's February 2016 accounts receivables in order to obtain additional cash to be extracted from AURN. Such accounts receivables were not collected or factored as of March 1, 2016, and thus became the property of NBN as a result of the automatic and immediate transfer of the majority partnership interest. By its actions, including those it is currently engaged in, the Debtor is effectively using its control of AURN and the shield of the automatic stay to continue its pattern and practice of looting the AURN partnership while frustrating NBN's ability to enforce and compel specific performance of the settlement agreement.

38.    In the absence of immediate relief from the automatic stay to allow NBN to enforce the terms of the Settlement Agreement, NBN believes that the Debtor will continue to cause irreparable damage to AURN and impair the value of the majority partnership interest in AURN, which NBN now owns under the terms of the Settlement Agreement.

F.    **Factors for Bad Faith Filing**

39.    <u>Single asset case</u>. Upon information and belief, the Debtor's sole asset with any significant value is its 51% partnership interest in AURN. This asset was scheduled to be transferred to NBN on March 1, 2016—the same day that the Debtor filed this case.

40.    <u>Few unsecured creditors</u>. Upon information and belief, the Debtor has few unsecured creditors. Only 32 entities are identified on the Debtor's creditor matrix. Further, as indicated on the list of the top 20 unsecured creditors filed with the Debtor's petition, the Debtor has only $301,752.31 in unsecured debts that are unrelated to the Settlement Agreement and the District Court litigation. Virtually all of these debts (apart from trial or legal counsel) constitute "programming expenses" that the Debtor already has withdrawn funds from AURN ostensibly for the purpose of paying these debts. Given that the top 20 list of unsecured creditors

encompasses all debts in excess of $600.00, it is reasonable to conclude that the Debtor's unsecured creditor body (unaffiliated with the District Court litigation) holds less than $350,000.00 in total debt.

41.     No cash or income.  Upon information and belief, the only cash or income generated by the Debtor is the cash and income that is distributed or paid to the Debtor by AURN at the Debtor's direction.  As set forth in detail in this Motion, a large portion of these payments are unjustified and improper.

42.     Prepetition conduct was improper.  The Debtor has used and is using its control of AURN to siphon funds from the partnership to subsidize and prop up Sheridan's operations.  Prior to the Petition Date, the Debtor improperly extracted from AURN in excess of $6,000,000 without providing any reasonably equivalent value in exchange.  In doing so, the Debtor has totally disregarded its fiduciary duties to NBN.

*[The remainder of this page was intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 4, 2016

_____
Chesley Maddox-Dorsey

Chief Executive Officer of Access.1
Communications Corp. and President of
NBN Broadcasting, Inc.

# APPENDIX A

Partnership Agreement

(Attached)

# APPENDIX B

Extension Letter

(Attached)

Case 16-20722-TPA    Doc 11    Filed 03/04/16    Entered 03/04/16 17:43:16    Desc Main
Document      Page 16 of 18

# APPENDIX C

Email Correspondence dated December 21-22, 2015

(Attached)

- 1 -